IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MESFIN FLAIG, | ) |
| Plaintiff, | ) Civil Action No. 2:12-cv-00839 |
| v. | ) Judge Mark R. Hornak |
| ALADDIN FOOD MANAGEMENT SERVICES, LLC, and KATHY ANDERS, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

**Mark R. Hornak, United States District Judge**

Pending before the Court is Defendants' Motion to Dismiss, ECF No. 6. The Court has considered Plaintiff Mesfin Flaig's Complaint, ECF No. 1, the pending Motion and Brief in Support, ECF No. 7, Plaintiff's Response in Opposition, ECF No. 12, and Brief in Opposition, ECF No. 13, and Defendants' Reply Brief, ECF No. 14. For the reasons that follow, Defendants' motion is granted in part and denied in part.

### I. FACTUAL BACKGROUND

When considering a motion to dismiss under Fed. R. Civ. P. 12, the Court must accept the factual allegations in the Complaint as true and draw all reasonable inferences in the Plaintiff's favor. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Therefore, for the purposes of the disposition of Defendants' Motion, the essential facts are as follows.

Plaintiff Mesfin Flaig alleges claims of employment discrimination on the basis of race and gender, and retaliation for engaging in protected acts, against Defendants Aladdin Food

Management Services, LLC ("Aladdin") and his supervisor at Aladdin, Kathy Anders ("Anders"). Mr. Flaig is a thirty year old African-American from Ethiopia who became a naturalized citizen of the United States in 1997. Compl. ¶ 4. Mr. Flaig worked as a dishwasher and later a cook for Aladdin, which provides the food services for the Oakland campus of Carlow University ("Carlow") in Pittsburgh, PA. *Id.* ¶¶ 5-11. Mr. Flaig worked for Aladdin in Carlow's main cafeteria for approximately five years. *Id.* ¶ 17.

The work environment changed for Mr. Flaig in the summer of 2009 his supervisor Kathy Anders allegedly started to make unwanted and unsolicited sexual advances towards him by touching him "in an inappropriate manner" such as "grabbing his buttocks," "rubbing his shoulders," and "invading his personal space." *Id.* ¶ 13. In addition, Ms. Anders asked Mr. Flaig and another African-American co-worker, Sean Diggs, to do some work relating to Anders' vacation home. *Id.* ¶ 15. Anders told Mr. Flaig she made this invitation to Mr. Flaig and Diggs so that Anders "could show them off" to her neighbors and friends. *Id.* Mr. Flaig and Diggs perceived this invitation to be both a sexist and racist comment. *Id.* Anders also invited Mr. Flaig to her Pittsburgh home for wine. *Id.* ¶ 15. Flaig refused both invitations. *Id.* ¶¶ 14-15.

As a result of Anders' conduct, Mr. Flaig and Diggs filed a grievance through their union in May of 2010. *Id.* ¶ 16. Shortly thereafter, the cafeterias were closed for the summer. When they returned to work in August, both men were transferred from the main kitchen/cafeteria to the grill/deli downstairs. *Id.* ¶ 17. Mr. Flaig alleges that his supervisors made this reassignment "in retaliation for" his filing a complaint. *Id.* At the grill, other workers would "slack-off" so that Mr. Flaig and Diggs would have to do their co-worker's jobs. *Id.* ¶ 18. The two also found the grill to be a "racially hostile environment" – in particular, a co-worker named Rose "exhibited racial animus towards Diggs and Flaig, cursing and swearing at them and generally engaging in

misconduct designed to get Diggs and Flaig fired." *Id.* Additionally, one white employee showed up to work "visibly intoxicated" and another white employee brought two ounces of marijuana to work, but "Aladdin management consistently closed its eyes to work rule violations by white employees." *Id.* ¶ 22-23. On the upshot, Mr. Flaig saw less of Anders – she worked daily in the cafeteria upstairs but only occasionally checked in on the grill downstairs. Compl. ¶ 17.

At some point in November 2010, Mr. Flaig received a raise from $8.35 per hour to $10.40 per hour. *Id.* ¶ 11. Nonetheless, Mr. Flaig noticed that about two weeks before he and Diggs were fired later in November, an advertisement appeared in Carlow's employment guide for two job openings for grill positions that "sounded identical" to those held Mr. Flaig and Diggs. *Id.* ¶ 19. When confronted, Anders reassured Mr. Flaig that he was not about to be fired. *Id.* On November 17, 2010 two Carlow police officers escorted Mr. Flaig to Aladdin's office, where Anders and Aladdin's in-house counsel informed Mr. Flaig that he was being terminated for "giving out free food at the grill." *Id.* ¶¶ 19-20. Mr. Flaig states that he was falsely accused of giving away free food, and that other employees did give out free food and were not disciplined. *Id.* ¶¶ 22, 28. He also states that he was terminated and unwarrantedly disciplined in retaliation for his having filed a grievance complaining about Anders' harassment. *Id.* ¶ 37.

## II. DISCUSSION

### A. Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Third Circuit has laid out a three step process for the Rule 12(b)(6) analysis:

> First, the Court must "take[] note of the elements a plaintiff must plead to state a claim." Second, the Court should identify allegations that, "because they are no

3

> more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a Court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

*Malleus*, 641 F.3d at 563 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 679 (2009)) (internal citations omitted).

The third step of the sequential evaluation requires this Court to consider the specific nature of the claim(s) presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." *See Iqbal*, 556 U.S. at 679. In short, a motion to dismiss should not be granted if a party alleges facts which could, if established at trial, entitle him to relief. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).

### B. Undisputed Claims

Mr. Flaig brings in Count I of his Complaint a claim of race and gender discrimination in violation of Title VII's substantive anti-discrimination provisions, 42 U.S.C. § 2000e-2(a)(1). Compl. ¶¶ 29-35. Defendants do not move to dismiss Count I. ECF No. 6 at 11. Additionally, Mr. Flaig brought in Counts III and IV of his Complaint claims arising under the Pennsylvania Human Relations Act, as Amended, 43 P.S. §§ 953 *et seq.*; Compl. ¶¶ 39-47, which Defendants also moved to dismiss. However, Mr. Flaig in his Response concedes that Counts III and IV should be dismissed. ECF No. 4 at 1; ECF No. 5 at 16. As such, Defendants' Motion to Dismiss with regards to Counts III and IV is granted. Therefore, only Count II remains in dispute between the parties, in which Plaintiff claims that Aladdin's actions constituted retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a).

**C. Retaliation Claim**

Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "In order to prevail on a claim for retaliation under Title VII, an employee must prove that (1) []he engaged in a protected employment activity, (2) [his] employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a 'causal link' exists between the adverse action and the protected activity." *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007). Defendants do not argue prong (1) – that Mr. Flaig engaged in a protected employment activity when he filed a grievance through his union, United Food and Commercial Workers Local #23, regarding Ms. Anders' alleged inappropriate behavior. However, Defendants contend that prongs (2) and (3) have not been sufficiently pled. The heart of Defendants' argument is that Plaintiff identifies two "adverse employment actions" on the part of Aladdin – the reassignment of Mr. Flaig from the main kitchen/cafeteria to the grill/deli downstairs in the same building ("the transfer"), and the eventual termination of Mr. Flaig ("the termination") – that each cannot survive under Rule 12(b)(6). ECF No. 7 at 5. Specifically, Defendants argue that the transfer did not constitute an "adverse employment action" under prong (2) at all, and that there is not a sufficient "causal link" between the termination and the filing of the grievance as required by prong (3). The Court will address each of these arguments in turn.

5

*1. The Transfer*

In *Burlington Northern v. White*, the Supreme Court articulated the standard for an adverse employment action:

> [Title VII's] antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment. . . . In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 67-68 (2006) (internal citations omitted). The Court recently reiterated that *Burlington* "held that Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 867-68 (2011). Even so, while the Court's holding in *Burlington* was broad, it was careful to limit the types of employer actions that may be considered "materially adverse."

> The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.' . . . We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.

*Burlington*, 548 U.S. at 68.

More specifically, *Burlington* and the lower court cases applying it have held that a reassignment in position *may*, but not necessarily does, constitute such an adverse employment action. In short, a reassignment to a position that is objectively equivalent to the one from which the employee was transferred does not constitute an adverse employment action. *See id.* at 71 (plaintiff transferred from a position that was "objectively considered a better job" to a position that was "more arduous and dirtier"); *DiCampli v. Korman Communities*, 257 F. App'x 497, 501

6

(3d Cir. 2007) (collecting cases and declining to find adverse employment action where there was "no objective evidence that the [new position] was less desirable or prestigious than" the previous one).

Here, Mr. Flaig alleges that "in retaliation for his having complained about Anders sexual harassment," he (along with Sean Diggs) was transferred "from the main cafeteria to the grill downstairs." Compl. ¶ 17. However, Mr. Flaig does not plead that the grill was in any way less desirable to employees than the main cafeteria was, whether in its pay, hours, the type of work performed, prestige, etc. Nor are there any facts in the record from which the Court could plausibly make such an inference. Mr. Flaig alleges in this context that he had worked in the main cafeteria for the previous five years, but his "purely subjective preferences" are not legally relevant. *DiClampi*, 257 F. App'x at 501.

Mr. Flaig does allege one way in which working at the grill might have been objectively less desirable – that it was a "racially hostile environment" in which his co-workers treated him in a "particularly demeaning" way. Compl. ¶ 18. However, these assertions of subsequent mistreatment at best indicate that his new position *became* undesirable after he had already been transferred. It does not indicate that it was undesirable *at the time of* the alleged "materially adverse action" – the transfer itself. Nor does Mr. Flaig plead that the supervisors who transferred him knew or intended that an environment where he would be subjected to a "racially hostile environment" would be a result of the transfer, so as to permit the inference that the grill *already was* or was known to be at the time of the transfer an objectively undesirable location.[1] In other words, even taking Mr. Flaig's allegations in the light most favorable to him, Mr. Flaig

---

[1] Plaintiff does make this specific factual assertion in his Brief in Opposition to Defendant's Partial Motion to Dismiss. ECF No. 13 at 8 ("This transfer was intended to place Flaig in a racially hostile environment."). However, Mr. Flaig is not entitled to a presumption of truthfulness for this new fact. A Plaintiff cannot rely on new facts alleged in a response to a motion to dismiss, but not pled in the complaint, in order to defeat the motion. *Hammond v. City of Phila.*, No. CIV. A. 00–5082, 2001 WL 823637, at *3 (E.D. Pa. June 29, 2001).

was transferred from one position (the cafeteria) to another objectively equivalent position in the same building (the grill), where he subsequently became the victim of the harassing activities of his coworkers. Thus, Mr. Flaig does not sufficiently allege that his transfer from the cafeteria to the grill was a "materially adverse action" as defined in *Burlington*. Therefore, Defendant's motion to dismiss Count II is granted with prejudice to the extent that Mr. Flaig may not argue that his transfer from the cafeteria to the grill was in and of itself a distinct "materially adverse action" for purposes of his retaliation claim. What happened to Mr. Flaig after he arrived at the grill may, if otherwise probative, be relevant to the balance of his claims.

### 2. *The Termination*

Defendants argue that Mr. Flaig's retaliation claim regarding his termination should be dismissed because he does not allege a sufficient "causal link" between his protected activity and his termination. A plaintiff can satisfy the requisite causal link in at least two ways: by demonstrating (1) that the temporal proximity between the protected activity and the adverse action that is "so close as to be unduly suggestive" of causation, *Williams v. Phila. Housing Auth.*, 380 F.3d 751, 760; or, in the absence of temporal proximity, (2) "timing plus other evidence," *id.*, for example, that the employer "engaged in a pattern of antagonism in the intervening period." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997); *Meyer v. Nicholson*, 441 F. Supp. 2d 735, 742-43 (W.D. Pa. 2006); *see Andreoli v. Gates*, 482 F.3d 641, 649-50 (3d Cir. 2007).[2] Although the Third Circuit has not stated an explicit period of time at which temporal proximity is no longer "unduly suggestive," it has held that a period of two months is too long. *See Williams*, 380 F.3d at 760.

---

[2] It is worth noting that while Supreme Court's 2006 decision in *Burlington* overturned the Third Circuit's analysis as to prong (2) of the prima facie retaliation case, the materially adverse action, it "left undisturbed" prong (3), the causal link. *Parker v. Univ. of Pa.*, 239 F. App'x 773, 776, n.2 (3d Cir. 2007).

Here, Mr. Flaig filed his grievance in May 2010 and was terminated on November 17, 2010. Even considering the two month gap over the summer when the cafeterias were not open, four months may be too long a period of time to be considered as being "unduly suggestive," standing on its own, of a causal link between the two events. However, Mr. Flaig has properly demonstrated "timing plus other evidence" – namely, that he was the victim of a "pattern of antagonism" in the period between his grievance and his termination. As noted above, shortly after Mr. Flaig filed the grievance in May, the cafeteria was closed for the summer. Compl. ¶¶ 16-17. When he returned to work in August, he was transferred to the grill. *Id.* ¶ 17. Mr. Flaig alleges that between August and November of 2010, he was subjected to harassment by his coworkers who were coming to the job intoxicated and in possession of drugs, which his employer overlooked. *Id.* ¶¶ 18, 22-23. Two weeks before their termination, Mr. Flaig and Mr. Diggs noticed that Carlow was advertising for two vacancies in their position. *Id.* ¶ 19. When Mr. Flaig was discharged, two Carlow police officers were sent to escort him off the premises. *Id.* ¶ 21. Taken together, these allegations assert the kind of continuous discriminatory treatment that would allow an inference of a causal link between Mr. Flaig's complaint and his termination six months later.[3]

Defendants also argue that Mr. Flaig cannot satisfy the causation prong because he has not specifically alleged that his employer knew of his grievance against Ms. Anders, which was filed through his union, United Food and Commercial Workers Local #23. In his Brief in Opposition, Mr. Flaig more specifically avers that "Defendants possessed knowledge of the internal grievance by virtue of the fact that it was filed per specific procedures as outlined in the

---

[3] While Mr. Flaig also states that "in November 2010" he was actually promoted from dishwasher to cook and his wages were raised, Compl. ¶¶ 11, 12, the Court does not find that this fact itself at this time defeats the inference of a causal link. This is especially so because the striking temporal proximity between the promotion (sometime in November 2010), and his termination on November 17 (especially given that Mr. Flaig's employer was advertising his position two weeks prior to November 17), may call into question the basis for this promotion.

collective bargaining agreement between Defendant Aladdin and [the union]." ECF No. 13 at 11. While, as noted above, Defendant is correct to assert that a Plaintiff cannot rely on new facts alleged in a response to a motion to dismiss in order to defeat the motion, *Hammond v. City of Phila.*, No. CIV. A. 00–5082, 2001 WL 823637, at *3 (E.D. Pa. June 29, 2001), the Court concludes that the absence of this specific factual averment is not fatal here. This is because *Twombly*'s standards are not so stringent as Defendants would have them. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 320 n.18 (3d Cir. 2010) ("The touchstone of Rule 8(a)(2) is whether a complaint's statement of facts is adequate to suggest an entitlement to relief under the legal theory invoked and thereby put the defendant on notice of the nature of the plaintiff's claim.") (citing *Twombly*, 550 U.S. at 565 n.10).

Even without specifically pleading that Defendant "had knowledge of" the grievance, "was aware of" it, or some statement of the like, such knowledge can be readily inferred from the facts as pled, read in the light most favorable to Mr. Flaig. The Carlow kitchens were a relatively small work environment – Ms. Anders, both Plaintiff's supervisor and the alleged harasser, worked daily in the cafeteria upstairs and personally checked in on the grill downstairs. Compl. ¶ 17. Moreover, it is common sense that the existence of a grievance alleging sexual harassment would be made known to relevant management in the ordinary course of business of just about any American workplace. *See Iqbal*, 556 U.S. at 633-64 ("whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense"). Thus, even without the benefit of the specific factual averment contained in Plaintiff's

response, Plaintiff has plausibly alleged in his Complaint that Defendants were aware of the grievance at the time adverse action was taken against him.[4]

Thus, with respect to the alleged adverse employment action of the termination, Defendant's motion to dismiss Count II is denied, and Plaintiff is permitted to introduce evidence that his termination (and the events leading up to it to the extent that they are probative) constituted an unlawful retaliation. An appropriate order will issue.

Mark R. Hornak
United States District Judge

Dated: October 23, 2012

cc: All counsel of record

---

[4] While the parties might vigorously contest whether such notice was actually present in this case, that is a battle to be fought at the summary judgment (or even at the trial) stage, once Plaintiff has had the benefit of discovery, and not at the motion to dismiss stage.

11